Robert A. Simon
State Bar No. 18390000
**WHITAKER CHALK SWINDLE**
**& SCHWARTZ, PLLC**
301 Commerce Street, Suite 3500
Fort Worth, Texas 76102
Telephone: (817) 878-0543
Facsimile: (817) 878-0501
**Proposed attorneys for GL Brands, Inc.,**
**f/k/a Freedom Leaf Inc., et al., Debtors**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO: 20-43800-elm-11 |
| GL BRANDS, INC., F/K/A FREEDOM LEAF INC. | § | CHAPTER 11 Joint Administration Requested |
| DEBTOR | § | |
| IN RE: | § | CASE NO: 20-43804- 11 |
| THE TEXAS WELLNESS CENTER LLC | § | CHAPTER 11 Joint Administration Requested |
| DEBTOR | § | |
| IN RE: | § | CASE NO: 20-43806-11 |
| ECS LABS LLC | § | CHAPTER 11 Joint Administration Requested |
| DEBTOR | § | |
| IN RE: | § | CASE NO: 20-43816- 11 |
| LEAFCEUTICALS, INC. | § | CHAPTER 11 Joint Administration Requested |
| DEBTOR | § | |
| IN RE: | § | CASE NO: 20-20-43815- 11 |
| B & B AESTHETICS LABS, LLC | § | CHAPTER 11 Joint Administration Requested |
| DEBTOR | § | |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS: (1) APPROVING DEBTORS' USE OF CASH COLLATERAL FOR 14 DAYS;
(2) APPROVING DEBTOR IN POSSESSION FINANCING FOR 14 DAYS; (3)
PROVIDING ADEQUATE PROTECTION TO THE INTERESTS OF THE EXISTING
SECURED CREDITOR; (4) GRANTING TO THE DIP LENDER AND AUTHORIZING
THE DEBTORS TO INCUR THE DIP LIENS AND ALLOWED SUPER-PRIORITY
ADMINISTRATIVE EXPENSE CLAIMS; AND (5) GRANTING RELATED RELIEF**

TO THE HONORABLE EDWARD LEE MORRIS,
UNITED STATES BANKRUPTCY JUDGE:

GL Brands, Inc., f/k/a Freedom Leaf Inc., a Nevada corporation based in the Northern

District of Texas ("GL Brands"), The Texas Wellness Center LLC ("TWC"), ECS Labs LLC,

("ECS"), Leafceuticals, Inc. ("LFC"), and B & B Aesthetics Labs, LLC ("B & B"), debtors-in-

possession, (collectively, the "Debtors"), file this Emergency Motion for Entry of Order (1)

Authorizing Use of Cash Collateral; (2) Approving Debtor in Possession Financing from the DIP

Lender (as defined below); (3) Providing Adequate Protection to the Interests of the Existing

Secured Creditor (as defined below); (4) Granting to the DIP Lender and authorizing the Debtors

to incur the DIP Liens (as defined below) and allowed super-priority administrative expense

claims; and (5) Granting Related Relief (the "Motion"). The Debtors seek approval of the Debtor

in Possession Financing Agreement substantially in the form of the document attached hereto as

Exhibit "1," entry of an Interim Order substantially in the form attached hereto as Exhibit "2" (the

"Interim Cash Collateral and DIP Financing Order"), and entry of a Final Order substantially in

the form attached hereto as Exhibit "3" (the "Final Cash Collateral and DIP Financing Order"),

pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(d)(1), 503(b), 507 and Federal Rules of

Bankruptcy Procedure 4001(b), (c), and (d), authorizing the Debtors to use cash collateral, borrow

money, fund its operations, pay salaries, and purchase inventory. In support, the Debtors

respectfully states the following:

**I.**

**PRELIMINARY STATEMENT**

1.     The lead Debtor, GL Brands, is a Nevada corporation, formed on February 21, 2013.  The Debtors formerly maintained their head office at 3939 Beltline Road Suite 350 in Addison, Texas.   Due to COVID-19, and the need to conserve cash, the Debtors' senior management now work from home.  The Debtors surrendered the leasehold in Addison and no longer occupy that location.  Three (3) of the Debtors' senior officers, the CEO (Carlo Frias), the VP for Finance (Alexandro Frias), and the CFO (Brian Moon) live in Tarrant County.   The Debtors' current mailing address is P.O. Box 470458, 3101 West 6th Street, Fort Worth, Texas 76107-9998.

2.     GL Brands is a public company that trades over the counter.  The Debtors' current structure emerged on May 31, 2019, when Freedom Leaf Inc. closed the purchase of ECS Labs, LLC, a Texas limited liability company that wholly owns two (2) subsidiaries, B & B Labs, LLC, a Texas limited liability company, and Texas Wellness Center, LLC, a Texas limited liability company (collectively, the "Green Lotus Companies").  On November 20, 2019, Freedom Leaf Inc. changed its name to GL Brands, Inc., by merging with a newly created Nevada subsidiary, called GL Brands Name Change Subsidiary, Inc.  GL Brands is now an audited, publicly reporting company traded under the symbol (OTC Pink: GRLB).   The Debtors anticipate they will consolidate the corporate structure through their plan of reorganization.

3.     The Debtors collectively operate a single business enterprise that sells hemp-based dietary and health supplements, including tinctures, softgels, gummies, sparkling beverages, vapes, flowers, pre-rolls, and topical ointments to promote general wellness and balance.  The active ingredients are Hemp oil and CBD.  Hemp oil is extracted from the seeds of the hemp plant.

CBD is cannabidiol, an oil extracted from the flowers, stems, and leaves of the hemp plant. The seeds are edible, and can be purchased in health food stores, but the Debtors' products are sold as nutritional supplements, not food items.

4. The Debtors' premier brands are Green Lotus™ Hemp and IrieCBD.™ The Debtors' products are consumer packaged goods available in drug stores, health foods stores, and stores specializing in dietary supplements in the United States and Mexico. The Debtors also sell directly to retail customers through two (2) websites. The Debtors' products enjoy a good reputation for quality and compete in a growing market segment. The Debtors believe that their business has a bright future if it can survive in the short run. The Debtors filed this Chapter 11 to reorganize their financing affairs, convert debt to equity and de-leverage the balance sheet.

5. Three of the founders of the Green Lotus Companies, Carlos Frias, Ngoc Quang "Daniel" Nguyen, and Alexandro Frias (collectively, the "GL Founders"), and the founder of Freedom Leaf Inc., Clifford Perry, collectively own a majority of the shares and exercise control of the Debtors.

6. The Debtors' pre-petition capital structure is overleveraged and unsustainable, as described below.

7. **Prepetition Founder Obligations**: The Debtors owe the GL Founders substantial sums of money pursuant to their employment agreements and for other borrowed money, totaling more than $5 million.

8. **Prepetition Unsecured Notes**: The Debtors owe MCP Wellness II LP, an affiliate of Merida (as defined below), approximately $5,442,740 pursuant to an unsecured convertible note issued on November 18, 2019. The Debtors, except for LFC, owe Merida Capital Partners II LP and Merida Capital Partners III LP (collectively, "Merida"), approximately $992,998 pursuant to

a series of unsecured promissory notes issued in 2020. Merida also owns approximately 4% of the issued and outstanding capital stock of GL Brands.

9. **Prepetition Secured Note**: The Debtors, except for LFC, owe approximately $260,240 (the "Existing Secured Debt") to Merida Capital Partners III LP (in such capacity, the "Existing Secured Creditor"), pursuant to a secured promissory note issued in 2020, with such obligations secured by pre-petition liens on all assets of the Debtors (the "Prepetition Collateral"). The Existing Secured Creditor has filed UCC-1 financing statements to perfect its pre-petition liens. Accordingly, the Existing Secured Creditor asserts pre-petition liens on all of the Prepetition Collateral, including all cash collateral, which liens the Debtors have agreed not to contest.

10. The Existing Secured Creditor is willing to permit use of its cash collateral, and the DIP Lender is willing to provide debtor in possession financing to the Debtors on commercially reasonable terms, in accordance with the terms and subject to the conditions of the DIP Financing Agreement, a true and correct copy of which, subject to Court approval, is attached hereto (the "DIP Financing Agreement"), incorporated herein by this reference, and marked as Exhibit "1."

11. In connection, with the DIP Financing Agreement, the Debtors and the DIP Lender have agreed to an interim (14) day budget (the "14 Day Budget") and final 13-week budget (the "DIP Budget"). The DIP Financing Agreement allows for agreed extensions of the 13-week DIP Budget. True and correct copies of the 14 Day Budget and the DIP Budget are attached to DIP Financing Agreement as Exhibit "A" and "B" thereto and are incorporated herein by this reference. A true and correct copy of the proposed Interim Order (the "Interim Order") approving the use of cash collateral and borrowing for a period of 14 days is attached hereto, incorporated herein by this reference, and marked as Exhibit "2." A true and correct copy of the proposed Final DIP Financing Order (the "Final Order") approving the use of cash collateral, the DIP Financing

Agreement, and DIP Budget is attached hereto, incorporated herein by this reference, and marked as Exhibit "3."

12.     Under the proposed terms of the DIP Financing Agreement, the Debtors propose to borrow, and the DIP Lender (as defined below) proposes to lend the Debtors up to $750,000 on a revolving basis in accordance with the 14 Day Budget and the DIP Budget (the "DIP Loan").

13.     The DIP Budget runs through the week of March 14, 2021. However, the DIP Financing Agreement allows for agreed extensions of the 13-week DIP Budget without further Order of the Court. The DIP Budget will end, and the DIP Loan (as defined below) will mature on March 31, 2021, unless the Debtors file a plan of reorganization by that date, and on June 30, 2021, if a plan of reorganization is not confirmed by that date. Such plan must provide that the DIP Obligations (as defined in the DIP Financing Agreement) will be repaid in full in cash or be otherwise acceptable to the DIP Lender. Otherwise, the DIP Obligations will be become immediately due and payable.

14.     The Debtors will be required to pay "Excess Cash" (as defined in the DIP Financing Agreement) back to the DIP Lender at the end of each week to reduce the principal balance. Excess Cash is defined as any amount greater than $25,000, other than the amounts needed by the Debtor for the expenses set forth in the DIP Budget for a particular Budget Period and the immediately subsequent Budget Period, each of which lasts for one (1) week. Repayments of "Excess Cash" may be reborrowed in accordance with the DIP Budget. The DIP Financing Agreement provides a $75,000 carve-out (the "Carve-out") from the cash collateral for certain administrative expenses other than the DIP Loan and usage of cash collateral.

15.     Under the DIP Financing Agreement, the Debtors agree to provide collateral security for the prompt and complete performance and payment when due of all DIP Obligations

(as defined in the DIP Financing Agreement) by granting to the DIP Lender automatically perfected, first priority, post-petition liens on all assets of the Debtors, subject only to the Carve-out (the "DIP Liens") and a super-priority administrative claim, subject only to the Carve-out, and the Debtors agree to provide adequate protection to the Existing Secured Creditor's interest in cash collateral by, among other things, granting automatically perfected, first priority post-petition replacement liens on all assets of the Debtors, subject only to the Carve-out and the DIP Liens, and a super-priority administrative claim, junior only to the super-priority administrative claim of the DIP Loan and subject only to the Carve-out.

16.     The Debtors will request a hearing on the Final Order at the end of fourteen (14) days from the effective date of the Interim Order.

## II.

## **REQUESTED RELIEF**

17.     By this Motion, the Debtors seek entry of Interim and Final Orders approving the use of cash collateral, the DIP Financing Agreement, and the Debtors' interim 14 Day Budget and final 13-week DIP Budget.   In summary, the Debtors seek authority to use cash collateral in accordance with the two Budgets, to grant to the DIP Lender the DIP Liens and a super-priority administrative claim, subject only to the Carve-out, and to grant to the Existing Secured Creditor as adequate protection automatically perfected, first priority, post-petition replacement liens on all assets of the Debtors, subject only to the Carve-out and the DIP Liens, and a super-priority administrative claim, junior only to the super-priority administrative claim of the DIP Loan and subject only to the Carve-out.   LFC did not grant a pre-petition lien to the Existing Secured Creditor and is not required to give adequate protection for use of cash collateral. LFC will provide adequate protection to the DIP Lender for the DIP Loan, as set forth below.

18.     In summary, the DIP Financing Agreement provides that that the Debtors will be entitled to borrow up to $750,000 from the DIP Lender on a revolving basis, at an annual interest rate of 15% (the "DIP Loan") in accordance with the terms and subject to the conditions of the DIP Financing Agreement. Thought this interest rate is high, the Debtors expect to file a plan of reorganization in March 2021, and do not expect to be in Chapter 11 for long. The total amount of interest should be reasonable in the context of the case. The Debtors will pay an initial 1% commitment fee of $7,500, which will be added to the principal balance. The Debtors will make an initial draw of $145,000 on the DIP Loan in the first week under this Interim Order. The Debtors are required to pay down the principal loan balance if and when "Excess Funds" (as defined in the DIP Financing Agreement) are available. Generally, "Excess Funds" means an amount greater than $25,000, other than the amounts needed by the Debtor for the expenses set forth in the DIP Budget for a particular Budget Period and the immediately subsequent Budget Period, each of which lasts for one (1) week. Repayments of "Excess Cash" may be reborrowed in accordance with the DIP Budget. The Debtors are permitted reborrow funds, as needed (in accordance with the DIP Budget) provided that the balance does not exceed $750,000. The Debtors are required to pay the reasonable fees of the DIP Lender's counsel, which are included in the 14 Day Budget and DIP Budget. To extent such professional fees exceed the budgeted amounts, the excess fees shall not themselves cause a variance from the DIP Budgets.

19.     Pursuant to 11 U.S.C. 364(a)(b), (c)(1) and (c)(2), the indebtedness represented by the DIP Loan would be secured and protected by an administrative claim superior to all other administrative claims, subject to a $75,000 carve-out (the "Carve-out") for certain other administrative claims, and by automatically perfected, first priority, post-petition liens on all assets of the Debtors to secure the post-petition advances, subject only to the Carve-out (the "DIP

Liens"). The Debtors do not seek authority to cross-collateralize the liens, but since the Existing Secured Creditor has pre-petition liens on all assets to secure the existing pre-petition indebtedness, and will receive replacement liens for use of cash collateral, this is not a meaningful distinction. Under the DIP Financing Agreement, the Debtors agree to provide adequate protection to the Existing Secured Creditor's interest in cash collateral by, among other things, granting a super-priority administrative claim to the Existing Secured Creditor, junior only to the super-priority administrative claim of the DIP Loan, and subject only to the Carve-Out, and granting automatically perfected, first priority post-petition replacement liens on all assets of the Debtors, subject only to the Carve-out and the DIP Liens. Under the DIP Finance Agreement, the Debtors do not grant liens to the Existing Secured Creditor or the DIP Lender on the Debtors' Chapter 5 causes of action or recoveries from such actions, if any.

20.      The terms of the DIP Loan are reasonable under the circumstances, and the Debtors are not able to find alternative financing or more favorable terms. The Debtors have spoken to another potential DIP lender and have not been offered more favorable terms. Because the Debtors' have negative shareholder equity, operating losses, very limited fixed assets, and have no unencumbered cash, no third-party commercial lender would take the risk involved in the DIP Financing Agreement. The DIP Lender is willing to take that risk because it has already made a substantial investment in the Debtors. The DIP Loan should provide the Debtors with sufficient liquidity to operate their business, pay for the expenses of the Chapter 11 cases, and get to plan confirmation. The terms are more favorable than the Debtors could get elsewhere. The DIP Financing Agreement and this Motion should be approved.

## III.

## SUMMARY OF TERMS

21.     The terms of the proposed DIP Loan are set forth in the attached Exhibit "1." In summary, the Debtors propose to borrow, and Merida Capital Partners III LP proposes to lend (in such capacity, the "DIP Lender") to the Debtors up to $750,000 on a revolving basis to finance the Debtors' operations in Chapter 11 through June 30, 2021. The Debtors anticipate having a confirmed plan of reorganization by that time. The DIP Loan will be evidenced by DIP Financing Agreement and the Final Order. The Debtors will pay an upfront, 1% commitment fee which will be added to the principal balance. The unpaid balance will bear interest at 15%. In the event of default, the default rate would be 200 basis points higher. The Debtors may re-borrow in accordance with the DIP Budget, and in accordance with the terms and subject to the conditions of the DIP Financing Agreement, provided that the total indebtedness does not exceed $750,000, without the written consent of the DIP Lender. The loan will have no penalty for prepayment, and the Debtors will be required to pay "Excess Cash" back to the DIP Lender at the end of each week to pay down the revolving balance. Excess Cash is defined as any amount greater than $25,000, other than the amounts needed for Debtors' operations under the DIP Budget for a particular Budget Period and the immediately subsequent Budget Period, each of which lasts for one (1) week. Repayments of "Excess Cash" may be reborrowed in accordance with the DIP Budget. The proceeds of the DIP Loan will be used to finance the Debtors' short-term and medium-term operations in accordance with the 14 Day and the Final Budget, attached to the proposed Interim Order and Final Order. Neither the Debtors nor the DIP Lender will be permitted to use the proceeds of DIP Loan to pay the Debtors' pre-petition obligations to the Existing Secured Creditor. On June 30, 2021, the DIP Loan shall mature, and all principal and accrued interest shall be due and payable that time.

22.     Pursuant to 11 U.S.C. §§ 364(a), (b), and (c)(1), the indebtedness under the DIP

Loan will receive super-priority administrative claims status under 11 U.S.C. §§ 503(a) and 507 and have priority over other administrative claims, subject to the $75,000 Carve-out for certain other administrative claims, including the professional fees of Debtors' counsel. In addition, pursuant to 11 U.S.C. § 364(c)(2) the DIP Loan will be secured by automatically perfected, first-priority, post-petition liens on all assets of the Debtors (the "DIP Liens"). The DIP Lender may, but shall not be required, to file UCC-1 financing statements, to evidence perfection of the DIP Liens.

23. In connection with the DIP Loan, the Existing Secured Creditor will permit the Debtors to use cash collateral in accordance with the 14 Day Budget and the DIP Budget. As adequate protection for such use, as part of the final DIP Financing order, the Existing Secured Creditor's pre-petition secured claim in the amount of $260,240 shall also be secured by a post-petition lien on all assets of all Debtors, except for LFC, and junior only to the DIP Lien and the Carve-out. The Debtors have agreed not to challenge the validity, extent, and perfection of the Existing Secured Creditor's pre-petition liens. LFC and the Existing Secured Creditor acknowledge that LFC's assets are not subject to the Existing Secured Debt. Under the DIP Finance Agreement, the Debtors do not grant liens on the Debtors' Chapter 5 causes of action or recoveries from such actions, if any.

## IV.

### JURISDICTION AND VENUE

24. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (D), and (G). Venue is proper in this district pursuant to 28 U.S.C. § 1409, as the Debtors are based in the Tarrant County, in the Northern District of Texas.

## V.

## **FACTUAL BACKGROUND**

A.    **Business History and Reasons for Chapter 11 Relief**

25.    The Debtors filed their Chapter 11 voluntary petitions on December 17, 2020 (the "Petition Date").  The Debtors maintain possession of their property and management of their financial affairs as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.  No creditors' committee has yet been formed, though the U.S. Trustee may attempt to form one.

26.    The lead Debtor is GL Brands.  The Debtors will seek joint administration with GL Brands as the lead case.  Joint administration makes sense as the Debtors run a single business that is jointly managed and controlled by the same individuals.  Since the Debtors have different creditors, the Debtors will not seek substantive consolidation at this time, though they may do so through a plan of reorganization.

27.    GL Brands is a Nevada corporation, formed on February 21, 2013.  The Debtors formerly maintained their head office at 3939 Beltline Road Suite 350 in Addison, Texas.  Due to COVID-19, and the need to conserve cash, the Debtors' senior management now works from home.  The Debtors surrendered the leasehold in Addison and no longer occupy that location. Three (3) of the Debtors' senior officers, the CEO (Carlo Frias), the VP for Finance (Alexandro Frias), and the CFO (Brian Moon) live in Tarrant County.  The Debtors' current mailing address is P.O. Box 470458, 3101 West 6th Street, Fort Worth, Texas 76107-9998.

28.    GL Brands is a public company that trades over the counter.  The Debtors' current structure emerged on May 31, 2019, when Freedom Leaf Inc. closed the purchase of ECS Labs, LLC, a Texas limited liability company that wholly owns two (2) subsidiaries, B & B Labs, LLC, a Texas limited liability company, and Texas Wellness Center, LLC, a Texas limited liability

company (collectively, the "Green Lotus Companies"). On November 20, 2019, Freedom Leaf Inc. changed its name to GL Brands, Inc., by merging with a newly created Nevada subsidiary, called GL Brands Name Change Subsidiary, Inc. GL Brands is now an audited, publicly reporting company traded under the symbol (OTC Pink: GRLB). The Debtors anticipate they will consolidate the corporate structure through their plan of reorganization.

29. The Debtors collectively operate a single business enterprise that sells hemp-based dietary and health supplements, including tinctures, softgels, gummies, sparkling beverages, vapes, flowers, pre-rolls, and topical ointments to promote general wellness and balance. In the 2018 Farm Bill, Congress legalized the cultivation of hemp and the manufacture and sale of hemp oil and CBD products provided that they did not contain more than 0.3 THC by dry weight. The Debtors' products do not contain more than 0.3 THC by dry weight. Accordingly, the Debtors' products are fully lawful under applicable state and federal law. The Debtors' products have a soothing or relaxing effect, and many customers use them for pain relief. However, the Debtors' products are not mind-altering. The Debtors' products are classified as supplements, not pharmaceuticals and they not regulated as pharmaceuticals. Because the Debtors' products are not classified as pharmaceuticals, the Debtors do not make specific health related claims about them.

30. The Debtors' premier brands are Green Lotus™ Hemp and IrieCBD. The products are consumer packaged goods available in drug stores, health foods stores, and stores specializing in dietary supplements in the United States and Mexico. The Debtors also sell directly to retail customers through two (2) websites. The Debtors' products enjoy a good reputation for quality and compete in a growing market segment. The Debtors believe that their business has a bright future if it can survive in the short run. The Debtors filed this Chapter 11 to reorganize their financing affairs, convert debt to equity and de-leverage the balance sheet.

31. Three of the founders of the Green Lotus Companies, Carlos Frias, Ngoc Quang "Daniel" Nguyen, , and Alexandro Frias (collectively, the "GL Founders"), and the founder of Freedom Leaf Inc., Clifford Perry, collectively own a majority of the shares and exercise control of the Debtors. Merida owns approximately 4% of the issued and outstanding shares.

32. The Debtors' pre-petition capital structure is overleveraged and unsustainable, as described herein.

33. **Prepetition Founder Obligations**: The Debtors owe the GL Founders substantial sums pursuant to their employment agreements and for other borrowed money, totaling more than $5 million.

34. **Prepetition Unsecured Notes**: The Debtors owe approximately $5,442,740 to MCP Wellness II, LP, an affiliate of Merida, pursuant to an unsecured convertible note issued on November 18, 2019. The Debtors, except for LFC, also owe Merida approximately $992,998 pursuant to a series of unsecured promissory notes issued in 2020.

35. **Prepetition Secured Note**: The Debtors, except for LFC, owe approximately $260,240 to Merida Capital Partners III LP (in such capacity, the "Existing Secured Creditor") pursuant to a secured promissory note issued in 2020, with such obligations secured by pre-petition liens on all assets of the Debtors (the "Prepetition Collateral"). The Existing Secured Creditor has filed UCC-1 financing statements to perfect its pre-petition liens. Accordingly, the Existing Secured Creditor asserts pre-petition liens on all of the Prepetition Collateral, including all cash collateral, which liens the Debtors have agreed not to contest.

36. Separate and apart from their overleveraged capital structure, the Debtors are running low on cash. Much of the Debtors' sales volume is derived from retails sales in brick and mortar store locations. The COVID-19 pandemic substantially reduced the Debtors' sales volume

and accelerated the need for Chapter 11 relief. The Debtors owe approximately $450,000 to various lessors and trade creditors. The Debtors require cash to meet payroll obligations and related taxes, pay sales taxes, purchase inventory, and pay lessors and licensors of software. Unless permitted to borrow money, the Debtors will run out of cash before the end of December 2020. If the Debtors run out of cash, they will be forced to close, resulting in the loss of going concern value. Accordingly, the Debtors have an immediate need to use cash collateral and to borrow money to sustain their operations and pay the expenses of the reorganization.

37.     The Debtors also have significant trade debt and liabilities on former leaseholds, totaling approximately $450,000. The Debtors are subject to one pre-petition judgment in favor of a trade creditor, in the amount of approximately $28,000. Those obligations are not secured.

38.     The Existing Secured Creditor is willing to permit use of its cash collateral, and the DIP Lender is willing to provide debtor in possession financing to the Debtors on commercially reasonable terms; provided that (i) the Existing Secured Creditor receives adequate protection, as and to the extent set forth in the proposed Interim Order, Final Order, and the DIP Financing Agreement (as defined herein), against the risk of any diminution in the value of its interests in the Prepetition Collateral, including receiving replacement liens in the Prepetition Collateral, and (ii) the DIP Lender receives the protections typically given to DIP financers, such as a super-priority administrative claim for the use of cash collateral and post-petition advances and a post-petition lien on all assets to secure post-petition financing, each subject to a carve out (set forth below) for certain other administrative claims. The Debtors, the Existing Secured Creditor and the DIP Lender have reached an agreement on the terms of the DIP Financing Agreement.

**B.**     **Use of Cash Collateral**

39.     The Debtors will need to use the Existing Secured Creditor's cash collateral to pay

normal business expenses, such as salaries, taxes, rent, inventory acquisition, and marketing costs. Without such expenditures, the Debtors could not operate and would be forced to shut down. The Debtors have little fixed capital. The Debtors' economic value lies in the future profits it can generate by selling its products. Thus, the Debtors must remain in business. To keep expenses in line with anticipated and available financing, the Debtors have created the 14 Day Budget and the DIP Budget to govern operations and expenses through June 30, 2021, by which time the Debtors expect to have a confirmed plan of reorganization in place. The Existing Secured Creditor and its affiliates have invested more than $6 million in the Debtors, in the form of stock purchases and loans. Those investments will be substantially devalued if the Debtors cease operations. Accordingly, the Existing Secured Creditor will consent to the use of cash collateral in accordance with the terms of the Interim Order and Final Orders attached hereto as Exhibits 2 and 3 and the associated 14 Day Budget and DIP Budget. Those Orders provide that the Debtors, except for LFC will grant replacement liens on all post-petition assets to secure the pre-petition indebtedness. All Debtor will adhere to the 14 Day Budget and the DIP Budget within permitted variances. The Existing Secured Creditor's interest in cash collateral, will be adequately protected by the preservation and continued operations of the Debtors' business and going concern value, and except as to LFC, granting of super-priority administrative claims status, replacement liens, and the adherence by all Debtors to the 14 Day Budget and DIP Budget, subject to Permitted Variances.

**C.  Proposed Debtor in Possession Financing**

40.     The Debtors do not anticipate that they will be able to generate sufficient cash from operations to finance their operations and the expenses of reorganization. For that reason, the DIP Loan is necessary.

41.     In connection with the DIP Financing Agreement, the Debtors, the Existing Secured

Creditor and the DIP Lender have agreed to the terms of an interim 14 day budget (the "14 Day Budget") and final 13-week budget (the "DIP Budget"), for which Court approval is requested. The DIP Budget runs through the week of March 14, 2021. However, the DIP Financing Agreement allows for agreed extensions of the 13-week DIP Budget without further Order of the Court. The DIP Budget will end, and the DIP Loan (as defined below) will mature on March 31, 2021, unless the Debtors file a plan of reorganization by that date, and on June 30, 2021, if a plan of reorganization is not confirmed by that date. Such plan must provide that the DIP Obligations (as defined in the DIP Financing Agreement) will be repaid in full in cash or be otherwise acceptable to the DIP Lender. Otherwise, the DIP Obligations will be become immediately due and payable.

42.     Under the proposed terms of the DIP Financing Agreement, the Debtors propose to borrow, and the DIP Lender proposes to lend the Debtors up to $750,000 on a revolving basis in accordance with the 14 Day Budget and the DIP Budget (the "DIP Loan"). The Debtors will pay an initial 1% commitment fee of $7,500, which will be added to the principal balance. The unpaid principal balance will bear interest at an annual rate of 15%, with a default rate of 17%. The Debtors are required to pay the reasonable fees of the DIP Lender's counsel, which are included in the 14 Day Budget and the DIP Budget. To the extent that such fees exceed the budgeted amounts, the excess shall not themselves cause a variance from the DIP Budget.

43.     The Debtors will make an initial draw of $145,000 in the DIP Loan in the first week under the proposed Interim Order and 14 Day Budget. The Debtor will borrow additional funds over the term of the DIP Budget. The Debtors will be required to pay "Excess Cash" (as defined in the DIP Financing Agreement) back to the DIP Lender at the end of each week to reduce the principal balance. Excess Cash is defined as any amount greater than $25,000, other than the

amounts needed by the Debtor for the expenses set forth in the DIP Budget for a particular Budget Period and the immediately subsequent Budget Period, each of which lasts for one (1) week. The Debtors may re-borrow in accordance with the DIP Budget, and in accordance with the terms and subject to the conditions of the DIP Financing Agreement, provided that the total indebtedness does not exceed $750,000, without the written consent of the DIP Lender.

44.     The DIP Financing Agreement provides a $75,000 carve-out (the "Carve-out") from the cash collateral for certain other administrative expenses, such as the Court-approved fees and expenses of the Debtors' professionals. The Carve-out is appropriate and the amount of the Carve-out is reasonable and adequate under the circumstances.

45.     Under the DIP Financing Agreement, and as proposed in the Motion, the Debtors, except for LFC, agree to provide adequate protection to the Existing Secured Creditor's interest in cash collateral, and all Debtors (including LFC) agree to provide collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of all DIP Obligations (as defined in the DIP Financing Agreement) as follows: (a) the preservation and continued operation of the Debtors' business and going concern value; (b) a super-priority administrative claim to the DIP Lender for the use of cash collateral and the DIP Loan, each subject only to the Carve-out; (c), the granting to the DIP Lender of automatically perfected, first priority post-petition liens on all assets of the Debtors, subject only to the Carve-out (the "DIP Liens"); (d) the granting to the Existing Secured Creditor of automatically perfected, first priority post-petition replacement liens on all assets of the Debtors, except for LFC, subject only to the Carve-out and the DIP Liens, and a super-priority administrative claim, junior only to the super-priority administrative claim of the DIP Loan and subject only to the Carve-out; and (e) the Debtors' adherence to the 14 Day Budget and DIP Budget, subject to Permitted Variances,

which are 10%.

46. The DIP Loan will mature: (a) upon the Effective Date of a plan of reorganization; (b) upon the sale of all or substantially all of the Debtors' assets; or (c) if the DIP Loan balance become due for any other reason, including an uncured Event of Default. The "Events of Default" are set forth in the DIP Financing Agreement and include, among others: (1) the failure to make any payment when due; (2) breaches of representations or warranties; (3) change of control; (4) the appointment of a trustee or examiner with expanded powers; (5) granting of a motion for relief from the automatic stay to foreclose on any collateral; (6) the expiration of Debtors' exclusivity; and (7) the filing of a plan for reorganization that does not provide for the full payment in cash of the DIP Loan, unless the DIP Lender gives consent. The DIP Loan also contains certain calendar-based benchmarks for maturity. The Debtors must file a plan of reorganization no later March 31, 2021, which either provides for full repayment in cash of the DIP Loan or is otherwise satisfactory to the DIP Lender, and the plan of reorganization must be confirmed by June 30, 2021. The Debtors will have the option to pay off the DIP Lender at maturity or at earlier date, if funds are available.

47. GL Brands owns certain shares of Rocky Mountain High Brands, Inc. ("RHM"), an unrelated company that markets CBD based beverages. GL Brands received the RMH shares as a result of the settlement of a business dispute unrelated to the Debtors' Chapter 11 filings. The RHM shares are subject to the Existing Secured Creditor's pre-petition liens. The Debtors will be permitted, though not required, to liquidate the RMH stock between January 1, 2021 and June 30, 2021, with the proceeds applied to repay the pre-petition Existing Secured Debt. The Existing Secured Creditor and the DIP Lender each consent to the stock sale and to the foregoing use of proceeds.

## VII.

## AUTHORITY AND ARGUMENT

### A. Use of Cash Collateral Should Be Approved.

48.     Section 363(c)(2) of the Bankruptcy Code governs the Court's approval of the use of cash collateral and provides that a debtor-in-possession may not use cash collateral without the consent of the secured party or approval by the Court. 11 U.S.C. §363(c)(2).  By obtaining approval from the Court to use cash collateral, however, a debtor may continue to operate its business and maintain and enhance the value of its lenders' collateral. *See e.g.*, *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991); *In re T.H.B. Corp.*, 85 B.R. 192, 195 (Bankr. D. Mass. 1988).   To the extent the Debtors' cash on hand represents "cash collateral," it is subject to the use restriction set forth in section 363(c)(2) of the Bankruptcy Code.   The Debtors, therefore, seek to use the cash collateral, consistent with the 14 Day Budget and DIP Budget to operate their business.  Specifically, the Debtors require the use of cash collateral to meet payroll and benefit obligations to their employees, to purchase inventor and pay vendors, to market their products, to preserve and protect their assets, and to generally and otherwise pay obligations critical to continuing the operation of their business.

49.     Additionally, following the commencement of the case, the Debtors will need cash on hand to satisfy their contractual obligations, such as leases, and license fees for software. Failure to pay such obligations on a timely basis would require the Debtors to cease business operations, which would result in irreparable harm to the Debtors and eliminate any ability to reorganize effectively.  The Debtors sell products through third-party retailers and on the internet. The Debtors own no real estate and have few fixed assets.  The Debtors principal assets is its inventory, accounts receivable, brand name, and customer relationships, whose value would

collapse if the Debtors stop doing business.  The real value in the Debtors' business is their ability to generate future cash flow from selling hemp oil and CBD products to the general public. Accordingly, the Debtors' going concern value is far greater than the liquidation value of their assets.  If the Debtors were authorized to use cash collateral and continued operating as a going concern, the unsecured creditors should receive a substantial distribution.  In a liquidation, the unsecured creditors would receive little or nothing, as the Existing Secured Creditor has liens on all significant assets to secure approximately $260,240 in debt.  In a liquidation, the Debtors' assets are not worth more than that amount.  Without immediate authorization from the Court to use cash collateral, the Debtors will be unable to operate their business and thereby preserve the value of its estate for the benefit of all creditors and parties-in-interest.

50.     It is well established that a Bankruptcy Court, where possible, should resolve issues in favor of preserving the business of the debtor as a going concern.

> A debtor, attempting to reorganize a business under Chapter 11, clearly has a compelling need to use cash collateral in its effort to rebuild. Without the availability of cash to meet daily operating expenses such as rent, payroll, utilities etc., the congressional policy favoring rehabilitation over economic failure would be frustrated.

*Chrysler Credit Corp. v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.)*, 727 F.2d 1017, 1019 (11th Cir. 1984); *see also In re Triplett*, 87 B.R. 25, 27 (Bankr. W.D. Tex. 1988) (Cash collateral may be used "for the general benefit of the estate and need not be devoted exclusively to the protection of the creditor or the collateral.").   Accordingly, to avoid immediate and irreparable harm, the Debtors require immediate use of cash collateral for the payment of necessary business expenses and to continue to operate its business during the period governed by the proposed Interim Order.

51.     Subject to the granting of replacement liens, and the other protection set forth herein, the Existing Secured Creditor has agreed to permit the Debtors use of cash collateral for 14 days in accordance with the 14 Day Budget and then on a final basis in accordance with DIP Budget.  The Court should grant the Debtors interim authority to use cash collateral in accordance with the 14 Day Budget, pending a final hearing.  Upon final hearing, after 14 days, the Court should approve the Debtors' use of cash collateral on a final basis in accordance with the DIP Budget.

**B.      The Proposed DIP Financing Should Be Approved.**

52.     11 U.S.C. § 364 governs post-petition financing in bankruptcy.  Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking post-petition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense . . . ." 11 U.S.C. § 364(c).  In evaluating proposed post-petition financing under Bankruptcy Code section 364(c) and (d), courts perform a qualitative analysis and generally consider similar factors, including whether: (a) unencumbered credit or alternative financing without super priority status is available to the debtor; (b) the credit transactions are necessary to preserve assets of the estate; (c) the terms of the credit agreement are fair, reasonable, and adequate; (d) the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and (e) the proposed financing agreement adequately protects prepetition secured creditors.  *See, e.g., In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (applying the first three factors); *In re Aqua Assoc.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544,

546 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)). For the reasons discussed below, the Debtor satisfies the standards required to obtain post-petition financing under section 364(c) of the Bankruptcy Code.

53.     Whether debtors were unable to obtain unsecured credit is determined by application of a "good-faith effort" standard, and debtors must make a good-faith effort to demonstrate that credit was not available without granting a security interest. *See In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."). The required showing under section 364 of the Bankruptcy Code that unsecured credit was not available is not rigorous. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender, particularly when "time is of the essence in an effort to preserve a vulnerable seasonal enterprise").

54.     The proposed DIP Loan with the DIP Lender provides the most favorable terms the Debtors could get under the circumstances. The Debtors have negative shareholder equity, operating losses, very limited fixed assets, and no unencumbered assets. The Debtors are not able to obtain post-petition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

55.     Indeed, prior to the Petition Date, the Debtors contacted at least one other potential lender to determine whether they would be willing to provide post-petition financing to the Debtors. However, given the Debtors' liquidity needs, their negative shareholder equity, and the

fact that substantially all of the Debtors' material assets are encumbered, the DIP Financing Agreement with the DIP Lender is the only way the Debtors will be able to borrow sufficient capital to fund their operations in bankruptcy and their reorganization. The Debtors respectfully submit that their efforts to obtain post-petition financing therefore satisfy the standards required under section 364(c) of the Bankruptcy Code. *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-49 (Bankr. D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores, Inc.,* 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

56.     In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances and disparate bargaining power of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.),* 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). The terms of the DIP Financing Agreement and DIP Loan with the DIP Lender are fair and appropriate. The terms are highly reasonable under the circumstances and should be approved.

57.     The Debtors' decision to enter into a post-petition financing arrangement under 11 U.S.C. § 364 is governed by the business judgment standard. *See, e.g., Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving post-petition credit facility because such facility "reflect[ed] sound and prudent

business judgment"); *Ames,* 115 B.R. at 38 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"). One court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985). Here, the Debtors' sound business judgment supports approval of the DIP Financing Agreement.

58.     Section 364(e) of the Bankruptcy Code provides that: "the reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal." 11 U.S.C. § 364(e). The Debtors and the DIP Lender are dealing with each other at arm's length and in good faith. Accordingly, the Interim and Final Orders approving the DIP Financing Agreement and DIP Loan provide the DIP Lender with the protections set forth in 11 U.S.C. § 364(e).

### C.     The Interests of the Existing Secured Creditor Are Adequately Protected

59.     The Existing Secured Creditor consents to the use of its cash collateral on the terms set forth herein, which provide it with adequate protection as follows: (a) the preservation and continued operation of the Debtors' business and going concern value; (b) except as to LFC, the

granting to the Existing Secured Creditor of automatically perfected, first priority post-petition replacement liens on all assets of the Debtors, subject only to the Carve-out and the DIP Liens, and a super-priority administrative claim, junior only to the super-priority administrative claim of the DIP Loan and subject only to the Carve-out; and (c) the Debtors' adherence to the 14 Day Budget and DIP Budget, subject to Permitted Variances.

**D.**     **Waiver of Applicable Stays**

60.     This matter is time sensitive. The Debtors need the ability to meet their payrolls, fulfill existing customer orders, and obtain new inventory before those sales are lost to market competitors. Accordingly, the Debtors request the waiver of any applicable stays of the effective date of the Court's Interim Order, including those arising under Federal Rules of Bankruptcy Procedures 4001 and 6004.

## VIII.

### REQUESTED RELIEF

.WHEREFORE, the Debtor requests that the Court: (1) enter an Order in substantially the form of the Debtor's proposed Interim Order, pursuant to 11 U.S.C. §§ 105, 362, 363(c)(2), 364(d)(1), 364(d)(2) and Federal Rule of Bankruptcy Procedure 4001(b), (c), and (d), authorizing the Debtors to (a) use cash collateral for 14 days in accordance with the 14 Day Budget; and (b) borrow money from the DIP Lender in accordance with the draw schedule set forth in the 14 Day Budget: (2) approve the 14 Day Interim Budget; (3) set a final hearing after as practicable after the expiration of 14 days to consider final approval of the DIP Finance Agreement, the DIP Loan, and the DIP Budget; (4) provide that the DIP Lender shall have the protections of Section 364(e) pending the final hearing, and grant the DIP Lender the DIP Liens, subject only to the Carve-Out, and a super-priority administrative claim for the use of cash collateral and the DIP Loan, each

subject only to the Carve-out; (5) grant the Existing Secured Creditor adequate protection of its interest in cash collateral, except as to LFC, by granting automatically perfected, first priority post-petition replacement liens on all assets of the Debtors, subject only to the Carve-out and the DIP Liens, and a super-priority administrative claim, junior only to the super-priority administrative claim of the DIP Loan and subject only to the Carve-out; (6) waiving any applicable stays of the effective date of the Order, and (7) granting the Debtor such other and further relief as may be just and proper.

December 18, 2020.

Respectfully submitted,

**WHITAKER CHALK SWINDLE & SCHWARTZ, PLLC**

By: /s/ *Robert A. Simon*
       Robert A. Simon
       State Bar No. 18390000
       301 Commerce Street, Suite 3500
       Fort Worth, Texas 76102
       Telephone: (817) 878-0543
       Facsimile: (817) 878-0501
       rsimon@whitakerchalk.com
       spierce@whitakerchalk.com
       **Proposed attorneys for the Debtors**

## CERTIFICATE OF SERVICE

I hereby certify, on this 18th day of December 2020, I served a true and correct copy of the forgoing Emergency Motion for Approval of Use of Cash Collateral and Debtor in Possession Financing upon all parties registered to receive electronic service via this Court's ECF notification system and upon the attached and upon the following attorneys by email:

    erin.schmidt2@usdoj.gov
    dstueben@kkwc.com

dkleiner@kkwc.com
carlos.frias@glbrands.com
brian@glbrands.com

 /s/ **_Robert A. Simon_**
Robert A. Simon