Robert A. Simon
State Bar No. 18390000
**WHITAKER CHALK SWINDLE
& SCHWARTZ, PLLC**
301 Commerce Street, Suite 3500
Fort Worth, Texas 76102
Telephone: (817) 878-0543
Facsimile: (817) 878-0501
**Proposed attorneys for GL Brands, Inc.,
f/k/a Freedom Leaf Inc., et al., Debtors**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO: 20-43800-elm-11 |
| GL BRANDS, INC., F/K/A FREEDOM LEAF INC. | § § § | CHAPTER 11 Joint Administration Requested |
| DEBTOR | § | |
| IN RE: | § § | CASE NO: 20-43804- 11 |
| THE TEXAS WELLNESS CENTER LLC | § § | CHAPTER 11 Joint Administration Requested |
| DEBTOR | § | |
| IN RE: | § § | CASE NO: 20-43806-11 |
| ECS LABS LLC | § § | CHAPTER 11 Joint Administration Requested |
| DEBTOR | § | |
| IN RE: | § § | CASE NO: 20-43816- 11 |
| LEAFCEUTICALS, INC. | § § | CHAPTER 11 Joint Administration Requested |
| DEBTOR | § | |
| IN RE: | § § | CASE NO: 20-20-43815- 11 |
| B & B AESTHETICS LABS, LLC | § § | CHAPTER 11 Joint Administration Requested |
| DEBTOR | § | |

**AMENDED DECLARATION OF BRIAN MOON IN SUPPORT OF DEBTORS
EMERGENCY MOTION FOR APPROVAL OF DEBTOR IN POSSESSION
FINANCING AND AUHORTIY TO USE CASH COLLATERAL-Page 1**
DMS 496136

**AMENDED DECLARATION OF BRIAN MOON, DEBTORS' CHIEF FINANCIAL OFFICER IN SUPPORT OF: (A) DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS: (1) APPROVING DEBTORS' USE OF CASH COLLATERAL FOR 14 DAYS; (2) APPROVING DEBTOR IN POSSESSION FINANCING FOR 14 DAYS; (3) PROVIDING ADEQUATE PROTECTION TO THE INTERESTS OF THE EXISTING SECURED CREDITOR; (4) GRANTING TO THE DIP LENDER AND AUTHORIZING THE DEBTORS TO INCUR THE DIP LIENS AND ALLOWED SUPER-PRIORITY ADMINISTRATIVE EXPENSE CLAIMS; AND (5) GRANTING RELATED RELIEF; (B) DEBTORS' EMERGENCY MOTION FOR AUTHORITY PAY PRE-PETITION WAGES AND SALARIES**

I, Brian Moon, hereby declare:

1. My name is Brian Moon. I am over 18 years of age. I have never been convicted of a felony, or of any crime involving the making or use of false statements. Except as otherwise stated, I have personal knowledge of the facts stated in the forgoing Declaration and such facts are true and correct to the best of my knowledge and belief, after reasonable investigation. If called to testify as to the truth of such facts, I could and would do so competently.

2. I live in Fort Worth, Tarrant County, Texas. I am a CPA licensed in the state of Texas. I am the Chief Financial officer of the five debtors in possession: (1) GL Brands, Inc., f/k/a Freedom Leaf Inc., a Nevada corporation based in the Northern District of Texas ("GL Brands") (2) The Texas Wellness Center LLC ("TWC"); (3) ECS Labs LLC, ("ECS"); (4) Leafceuticals, Inc. ("LFC"); and (5) B & B Aesthetics Labs, LLC ("B & B"), debtors-in-possession, (collectively, the "Debtors"). My work includes accounting, budgeting and financial management for the Debtors. Through my work, I have been familiar with their business and financial affairs.

3. The Debtors need outside financing to continue operations and to pay the expenses of their reorganization. For that reason, the Debtors have filed their Emergency Motion for Entry of Order (1) Authorizing Use of Cash Collateral; (2) Approving Debtor in Possession Financing from the DIP Lender (as defined below); (3) Providing Adequate Protection to the Interests of the Existing Secured Creditor (as defined below); (4) Granting to the DIP Lender and authorizing the Debtors to incur the DIP Liens (as

defined below) and allowed super-priority administrative expense claims; and (5) Granting Related Relief [Docket No. 8 in the *GL Brands* case] (the "Motion"). The Debtors seek approval of the Debtor in Possession Financing Agreement substantially in the form of the document attached to the Motion as Exhibit "1," entry of an Interim Order substantially in the form attached to the Motion as Exhibit "2" (the "Interim Cash Collateral and DIP Financing Order")[1], and, upon final hearing, entry of a Final Order substantially in the form attached to the Motion as Exhibit "3" (the "Final Cash Collateral and DIP Financing Order"), pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(d)(1), 503(b), 507 and Federal Rules of Bankruptcy Procedure 4001(b), (c), and (d), authorizing the Debtors to use cash collateral, borrow money, fund its operations, pay salaries, and purchase inventory.

    4.  The proposed DIP Lender is Merida Capital Partners III, L.P (in such capacity the "DIP Lender.") The same entity is also an existing secured creditor with a lien on all assets of the Debtors, except the assets of LFC (in such capacity the "Existing Secured Creditor"). Though I am not a lawyer, the Debtors' counsel has explained to me the definition of the term "cash collateral" as used in 11 U.S.C. § 363(a). Based upon that definition, the Existing Secured Creditor has a lien on the cash collateral of all Debtors, except for LFC.

  A.  **Business History and Reasons for Chapter 11 Relief**

    5.  GL Brands filed its Chapter 11 voluntary petition on the afternoon of December 17, 2020 in this Court. The other four Debtors, TWC, ECS, LFC, B & B filed their voluntary petitions on the following day December 18, 2020 (collectively the "Petition Dates"). The Debtors maintain possession of their property and management of their financial affairs as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. No creditors' committee has yet been formed, though the Debtors' counsel has informed me that the U.S. Trustee may attempt to form one.

---

[1] Since the Motion was filed, the Debtors have revised the Interim Cash Collateral and DIP Financing Order to accommodate some of the comments and objections of the Office of U.S. Trustee. Some changes the Debtors were unable to accept without the concurrence of the DIP Lender.

**AMENDED DECLARATION OF BRIAN MOON IN SUPPORT OF DEBTORS EMERGENCY MOTION FOR APPROVAL OF DEBTOR IN POSSESSION FINANCING AND AUHORTIY TO USE CASH COLLATERAL-Page 3**
DMS 496136

6. The lead Debtor is GL Brands. The Debtors will seek joint administration with GL Brands as the lead case. Joint administration makes sense as the Debtors run a single business that is jointly managed and controlled by the same individuals. Since the Debtors have different creditors, the Debtors will not seek substantive consolidation at this time, though they may do so through a plan of reorganization.

7. GL Brands is a Nevada corporation, formed on February 21, 2013. The Debtors formerly maintained their head office at 3939 Beltline Road Suite 350 in Addison, Texas. Due to COVID-19, and the need to conserve cash, the Debtors' senior management now works from home. The Debtors surrendered the leasehold in Addison and no longer occupy that location. Three (3) of the Debtors' senior officers, the CEO (Carlo Frias), the VP for Finance (Alexandro Frias), and the CFO (Brian Moon) live in Tarrant County. The Debtors' current mailing address is P.O. Box 470458, 3101 West 6th Street, Fort Worth, Texas 76107-9998.

8. GL Brands is a public company that trades over the counter. The Debtors' current structure emerged on May 31, 2019, when Freedom Leaf Inc. closed the purchase of ECS Labs, LLC, a Texas limited liability company that wholly owns two (2) subsidiaries, B & B Labs, LLC, a Texas limited liability company, and Texas Wellness Center, LLC, a Texas limited liability company (collectively, the "Green Lotus Companies"). On November 20, 2019, Freedom Leaf Inc. changed its name to GL Brands, Inc., by merging with a newly created Nevada subsidiary, called GL Brands Name Change Subsidiary, Inc. GL Brands is now an audited, publicly reporting company traded under the symbol (OTC Pink: GRLB). The Debtors anticipate they will consolidate the corporate structure through their plan of reorganization.

9. The Debtors collectively operate a single business enterprise that sells hemp-based dietary and health supplements, including tinctures, softgels, gummies, sparkling beverages,

vapes, flowers, pre-rolls, and topical ointments to promote general wellness and balance. In the 2018 Farm Bill, Congress legalized the cultivation of hemp and the manufacture and sale of hemp oil and CBD products provided that they did not contain more than 0.3 THC by dry weight. The Debtors' products do not contain more than 0.3 THC by dry weight. Accordingly, the Debtors' products are fully lawful under applicable state and federal law. The Debtors' products have a soothing or relaxing effect, and many customers use them for pain relief. However, the Debtors' products are not mind-altering. The Debtors' products are classified as supplements, not pharmaceuticals and they not regulated as pharmaceuticals. Because the Debtors' products are not classified as pharmaceuticals, the Debtors do not make specific health related claims about them.

10. The Debtors' premier brands are Green Lotus™ Hemp and IrieCBD. The products are consumer packaged goods available in drug stores, health foods stores, and stores specializing in dietary supplements in the United States and Mexico. The Debtors also sell directly to retail customers through two (2) websites. The Debtors' products enjoy a good reputation for quality and compete in a growing market segment. The Debtors believe that their business has a bright future if it can survive in the short run. The Debtors filed this Chapter 11 to reorganize their financing affairs, convert debt to equity and de-leverage the balance sheet.

11. Three of the founders of the Green Lotus Companies, Carlos Frias, Ngoc Quang "Daniel" Nguyen, , and Alexandro Frias (collectively, the "GL Founders"), and the founder of Freedom Leaf Inc., Clifford Perry, collectively own a majority of the shares and exercise control of the Debtors. Merida owns approximately 4% of the issued and outstanding shares.

12. The Debtors' pre-petition capital structure is overleveraged and unsustainable, as described herein.

B. **Debtors' Capital Structure**

13. **Prepetition Founder Obligations**: The Debtors owe the GL Founders substantial sums pursuant to their employment agreements and for other borrowed money, totaling more than $5 million.

14. **Prepetition Unsecured Notes**: The Debtors owe approximately $5,442,740 to MCP Wellness II, LP, an affiliate of Merida, pursuant to an unsecured convertible note issued on November 18, 2019. The Debtors, except for LFC, also owe Merida approximately $992,998 pursuant to a series of unsecured promissory notes issued in 2020.

15. **Prepetition Secured Note**: The Debtors, except for LFC, owe approximately $260,240 to Merida Capital Partners III LP (in such capacity, the "Existing Secured Creditor") pursuant to a secured promissory note issued in 2020, with such obligations secured by pre-petition liens on all assets of the Debtors (the "Prepetition Collateral"). The Existing Secured Creditor has filed UCC-1 financing statements to perfect its pre-petition liens. Accordingly, the Existing Secured Creditor asserts pre-petition liens on all of the Prepetition Collateral, including all cash collateral, which liens the Debtors have agreed not to contest.

16. Separate and apart from their overleveraged capital structure, the Debtors are running low on cash. Much of the Debtors' sales volume is derived from retails sales in brick and mortar store locations. The COVID-19 pandemic substantially reduced the Debtors' sales volume and accelerated the need for Chapter 11 relief. The Debtors owe approximately $450,000 to various lessors and trade creditors. The Debtors require cash to meet payroll obligations and related taxes, pay sales taxes, purchase inventory, and pay lessors and licensors of software. Unless permitted to borrow money, the Debtors will run out of cash before the end of December 2020. If the Debtors run out of cash, they will be forced to close, resulting in the loss of going

concern value. Accordingly, the Debtors have an immediate need to use cash collateral and to borrow money to sustain their operations and pay the expenses of the reorganization.

17. The Debtors also have significant trade debt and liabilities on former leaseholds, totaling approximately $450,000. The Debtors are subject to one pre-petition judgment in favor a trade creditor, in the amount of approximately $28,000. Those obligations are not secured.

18. The Existing Secured Creditor is willing to permit use of its cash collateral, and the DIP Lender is willing to provide debtor in possession financing to the Debtors on commercially reasonable terms; provided that (i) the Existing Secured Creditor receives adequate protection, as and to the extent set forth in the proposed Interim Order, Final Order, and the DIP Financing Agreement (as defined herein), against the risk of any diminution in the value of its interests in the Prepetition Collateral, including receiving replacement liens in the Prepetition Collateral, and (ii) the DIP Lender receives the protections typically given to DIP financers, such as a super-priority administrative claim for the use of cash collateral and post-petition advances and a post-petition lien on all assets to secure post-petition financing, each subject to a carve out (set forth below) for certain other administrative claims. The Debtors, the Existing Secured Creditor and the DIP Lender have reached an agreement on the terms of the DIP Financing Agreement.

C. **Use of Cash Collateral**

19. The Debtors will need to use the Existing Secured Creditor's cash collateral to pay normal business expenses, such as salaries, taxes, rent, inventory acquisition, and marketing costs. Without such expenditures, the Debtors could not operate and would be forced to shut down. The Debtors have little fixed capital. The Debtors' economic value lies in the future profits it can generate by selling its products. Thus, the Debtors must remain in business. To keep expenses in line with anticipated and available financing, the Debtors have created the 14 Day Budget and the

DIP Budget to govern operations and expenses through June 30, 2021, by which time the Debtors expect to have a confirmed plan of reorganization in place. The Existing Secured Creditor and its affiliates have invested more than $6 million in the Debtors, in the form of stock purchases and loans. Those investments will be substantially devalued if the Debtors cease operations. Accordingly, the Existing Secured Creditor will consent to the use of cash collateral in accordance with the terms of the revised Interim Order and Final Orders to be presented at the hearing set on December 22, 2020 the associated 14 Day Budget and DIP Budget. Those Orders provide that the Debtors, except for LFC will grant replacement liens on all post-petition assets to secure the pre-petition indebtedness. All Debtor will adhere to the 14 Day Budget and the DIP Budget within permitted variances. The Existing Secured Creditor's interest in cash collateral, will be adequately protected by the preservation and continued operations of the Debtors' business and going concern value, and except as to LFC, granting of super-priority administrative claims status, replacement liens, and the adherence by all Debtors to the 14 Day Budget and DIP Budget, subject to Permitted Variances.

### D. Proposed Debtor in Possession Financing

20. The Debtors do not anticipate that they will be able to generate sufficient cash from operations to finance their operations and the expenses of reorganization. For that reason, the DIP Loan is necessary.

21. In connection with the DIP Financing Agreement, the Debtors, the Existing Secured Creditor and the DIP Lender have agreed to the terms of an interim 14 day budget (the "14 Day Budget") and final 13-week budget (the "DIP Budget"), for which Court approval is requested. A true and correct copy of the 14 Day Budget is attached is attached hereto, incorporated herein by this reference and marked as **Exhibit "A."** A true and correct copy of the 13-week final DIP

Budget is attached hereto, incorporated herein by this reference, and marked as **Exhibit "B."**

22. The DIP Budget runs through the week of March 14, 2021. However, the DIP Financing Agreement allows for agreed extensions of the 13-week DIP Budget without further Order of the Court. The DIP Budget will end, and the DIP Loan (as defined below) will mature on March 31, 2021, unless the Debtors file a plan of reorganization by that date, and on June 30, 2021, if a plan of reorganization is not confirmed by that date. Such plan must provide that the DIP Obligations (as defined in the DIP Financing Agreement) will be repaid in full in cash or be otherwise acceptable to the DIP Lender. Otherwise, the DIP Obligations will be become immediately due and payable.

23. Under the proposed terms of the DIP Financing Agreement, the Debtors propose to borrow, and the DIP Lender proposes to lend the Debtors up to $750,000 on a revolving basis in accordance with the 14 Day Budget and the DIP Budget (the "DIP Loan"). The Debtors will pay an initial 1% commitment fee of $7,500, which will be added to the principal balance. The unpaid principal balance will bear interest at an annual rate of 15%, with a default rate of 17%. The Debtors are required to pay the reasonable fees of the DIP Lender's counsel, which are included in the 14 Day Budget and the DIP Budget. To the extent that such fees exceed the budgeted amounts, the excess shall not themselves cause a variance from the DIP Budget.

24. The Debtors will make an initial draw of $145,000 in the DIP Loan in the first week under the proposed Interim Order and 14 Day Budget. The Debtor will borrow additional funds over the term of the DIP Budget. The Debtors will be required to pay "Excess Cash" (as defined in the DIP Financing Agreement) back to the DIP Lender at the end of each week to reduce the principal balance. Excess Cash is defined as any amount greater than $25,000, other than the amounts needed by the Debtor for the expenses set forth in the DIP Budget for a particular Budget

Period and the immediately subsequent Budget Period, each of which lasts for one (1) week. The Debtors may re-borrow in accordance with the DIP Budget, and in accordance with the terms and subject to the conditions of the DIP Financing Agreement, provided that the total indebtedness does not exceed $750,000, without the written consent of the DIP Lender.

25. The DIP Financing Agreement provides a $75,000 carve-out (the "Carve-out") from the cash collateral for certain other administrative expenses, such as the Court-approved fees and expenses of the Debtors' professionals. The Carve-out is necessary to assure payment of the expenses of the reorganization, in the professional fees of Debtors' counsel, in case the reorganization is not successful, and the amount of the Carve-out is reasonable and adequate under the circumstances.

26. Under the DIP Financing Agreement, and as proposed in the Motion, the Debtors, except for LFC, agree to provide adequate protection to the Existing Secured Creditor's interest in cash collateral, and all Debtors (including LFC) agree to provide collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of all DIP Obligations (as defined in the DIP Financing Agreement) as follows: (a) the preservation and continued operation of the Debtors' business and going concern value; (b) a super-priority administrative claim to the DIP Lender for the use of cash collateral and the DIP Loan, each subject only to the Carve-out; (c), the granting to the DIP Lender of automatically perfected, first priority post-petition liens on all assets of the Debtors, subject only to the Carve-out (the "DIP Liens"); (d) the granting to the Existing Secured Creditor of automatically perfected, first priority post-petition replacement liens on all assets of the Debtors, except for LFC, subject only to the Carve-out and the DIP Liens, and a super-priority administrative claim, junior only to the super-priority administrative claim of the DIP Loan and subject only to the Carve-out; and (e)

the Debtors' adherence to the 14 Day Budget and DIP Budget, subject to Permitted Variances, which are 10%.

27. The DIP Loan will mature: (a) upon the Effective Date of a plan of reorganization; (b) upon the sale of all or substantially all of the Debtors' assets; or (c) if the DIP Loan balance become due for any other reason, including an uncured Event of Default. The "Events of Default" are set forth in the DIP Financing Agreement and include, among others: (1) the failure to make any payment when due; (2) breaches of representations or warranties; (3) change of control; (4) the appointment of a trustee or examiner with expanded powers; (5) granting of a motion for relief from the automatic stay to foreclose on any collateral; (6) the expiration of Debtors' exclusivity; and (7) the filing of a plan for reorganization that does not provide for the full payment in cash of the DIP Loan, unless the DIP Lender gives consent. The DIP Loan also contains certain calendar-based benchmarks for maturity. The Debtors must file a plan of reorganization no later March 31, 2021, which either provides for full repayment in cash of the DIP Loan or is otherwise satisfactory to the DIP Lender, and the plan of reorganization must be confirmed by June 30, 2021. The Debtors will have the option to pay off the DIP Lender at maturity or at earlier date, if funds are available.

28. GL Brands owns certain shares of Rocky Mountain High Brands, Inc. ("RHM"), an unrelated company that markets CBD based beverages. GL Brands received the RMH shares as a result of the settlement of a business dispute unrelated to the Debtors' Chapter 11 filings. The RHM shares are subject to the Existing Secured Creditor's pre-petition liens. The under the proposed DIP Financing Agreement and proposed Final Order, the Debtors will be permitted, though not required, to liquidate the RMH stock between January 1, 2021 and June 30, 2021, with the proceeds applied to repay the pre-petition Existing Secured Debt. The Existing Secured

Creditor and the DIP Lender each consent to the stock sale and to the foregoing use of proceeds.

### E. The Motion Should Be Approved

29. The Debtors seek to use the cash collateral, consistent with the 14 Day Budget and DIP Budget to operate their business. Specifically, the Debtors require the use of cash collateral to meet payroll and benefit obligations to their employees, to purchase inventor and pay vendors, to market their products, to preserve and protect their assets, and to generally and otherwise pay obligations critical to continuing the operation of their business. .

30. Additionally, the Debtors will need cash on hand to satisfy their contractual obligations, such as leases, and license fees for software. Failure to pay such obligations on a timely basis would require the Debtors to cease business operations, which would result in irreparable harm to the Debtors and eliminate any ability to reorganize effectively. The Debtors sell products through third-party retailers and on the internet. The Debtors own no real estate and have few fixed assets. The Debtors principal assets is its inventory, accounts receivable, brand name, and customer relationships, whose value would collapse if the Debtors stop doing business.

31. The real value in the Debtors' business is their ability to generate future cash flow from selling hemp oil and CBD products to the general public. Accordingly, the Debtors' going concern value is far greater than the liquidation value of their assets. If the Debtors were authorized to use cash collateral and continued operating as a going concern, the unsecured creditors should receive a substantial distribution. In a liquidation, the unsecured creditors would receive little or nothing, as the Existing Secured Creditor has liens on all significant assets to secure approximately $260,240 in debt. In a liquidation, the Debtors' assets are not worth more than that amount. Without immediate authorization from the Court to use cash collateral, the Debtors will be unable to operate their business and thereby preserve the value of its estate for the benefit of all creditors

and parties-in-interest. Accordingly, to avoid immediate and irreparable harm, the Debtors require immediate use of cash collateral for the payment of necessary business expenses and to continue to operate its business during the period governed by the proposed Interim Order.

32. While the proposed 15% interest rate is high, the Debtors do not anticipate being in Chapter 11 for very long. The purpose of the reorganization is to de-leverage the Debtors by converting debt to equity. The Debtors anticipate that a plan will be filed by the end of March 2021 and confirmed by June 30, 2021. Hence, the actual amount of interest accrual should be reasonable in the context of the cases.

33. Due to the Debtors' economic circumstances, the proposed DIP Loan with the DIP Lender provides the most favorable terms the Debtors could get. The Debtors have negative shareholder equity, operating losses, very limited fixed assets, and no unencumbered assets. The Debtors are not able to obtain post-petition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

34. Prior to the Petition Date, the Debtors contacted at least one other potential lender to determine whether they would be willing to provide post-petition financing to the Debtors. However, given the Debtors' liquidity needs, their negative shareholder equity, and the fact that substantially all of the Debtors' material assets are encumbered, the DIP Financing Agreement with the DIP Lender is the only way the Debtors will be able to borrow sufficient capital to fund their operations in bankruptcy and their reorganization.

35. My understanding is that the Debtors' decision to enter into a post-petition financing arrangement under 11 U.S.C. § 364 is governed by the business judgment standard. *See, e.g., Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R.

964, 974 (Bankr. D. Del. 1994) (approving post-petition credit facility because such facility "reflect[ed] sound and prudent business judgment"). The DIP Finance Agreement, the proposed DIP Loan and the terms of use of cash collateral are appropriate exercise of the Debtors' business judgment. The terms are highly reasonable under the circumstances and should be approved.

36. Th Debtors; counsel has informed me that Section 364(e) of the Bankruptcy Code provides that: "the reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal." 11 U.S.C. § 364(e). The Debtors and the DIP Lender have negotiated with each other at arm's length and in good faith. Accordingly, the Interim and Final Orders approving the DIP Financing Agreement and DIP Loan provide the DIP Lender with the protections set forth in 11 U.S.C. § 364(e).

37. The Existing Secured Creditor consents to the use of its cash collateral on the terms set forth herein, which provide it with adequate protection as follows: (a) the preservation and continued operation of the Debtors' business and going concern value; (b) except as to LFC, the granting to the Existing Secured Creditor of automatically perfected, first priority post-petition replacement liens on all assets of the Debtors, subject only to the Carve-out and the DIP Liens, and a super-priority administrative claim, junior only to the super-priority administrative claim of the DIP Loan and subject only to the Carve-out; and (c) the Debtors' adherence to the 14 Day Budget and DIP Budget, subject to Permitted Variances.

38.     The Debtors have 13 employees, who do the Debtors' work. Technically, they are employed by GL Brands, though they are actually paid by TWC. Their pay period began on December 6, 2020 and ended on December 19, 2020. Under the terms of their employment, the scheduled payday is December 24, 2020. These employees are essential to the operation of the Debtors' business, and they have earned their compensation. The Debtors will require the continued services of these employees in the future. If the employees were not paid, they would seek other employment. Accordingly, paying these employees is essential for preservation of the Debtors' business and the value of their estates.

39.     The employee' portion of the payroll is $44,632.31. On top of that, the Debtors are required are required to pay employment taxes. The Debtors' proposed 14 Day Budget, approved by the DIP Lender, is $49,395. The DIP Lender has agreed in the DIP Financing Agreement and in the proposed Interim Order to lend the Debtor the funds necessary to cover the payroll. No employee is owed by more than $5,669.23.

40.     A true and correct list of the employees and the amount owed is attached hereto, incorporated herein by this reference, and marked as **Exhibit "C."**

F.     **Waiver of Applicable Stays**

41.     This matter is time sensitive. The Debtors need the ability to meet their payrolls, fulfill existing customer orders, and obtain new inventory before those sales are lost to market competitors. Accordingly, the Debtors require the waiver of any applicable stays of the effective date of the Court's Interim Order, including those arising under Federal Rules of Bankruptcy Procedures 4001 and 6004.

I hereby certify that I make this Amended Declaration under penalty of perjury, pursuant to the laws of the United States of America, on this 21st day of December 2020, at Fort Worth, Texas.

*Brian D Moon*
DocuSigned by: 2D630CEB128A4CD...

**Brian Moon, CFO of the Debtors**

## CERTIFICATE OF SERVICE

I hereby certify, on this 21st day of December 2020, I served a true and correct copy of the forgoing Amended Declaration of Brian Moon upon all parties registered to receive electronic service via this Court's ECF notification system and upon the attached list and to the following attorneys by email:

erin.schmidt2@usdoj.gov
dstueben@kkwc.com
dkleiner@kkwc.com

/s/ *Robert A. Simon*
Robert A. Simon

| GL BRANDS | 14 Day Budget | |
|---|---|---|
| | Week 1 | Week 2 |
| Week Commencing (Sunday) | 12/20/20 | 12/27/20 |
| Beginning Cash | 114 | 10,349 |
| Operating Cash Receipts | 5,000 | 16,710 |
| Cash Disbursements | | |
| Payroll: | | |
| Payroll & Benefits (PEO) (a) | (49,395) | |
| Contracted Employees | | |
| COVID-19 Employer SS Deferral Repayment | | |
| Total Payroll | (49,395) | - |
| COGS Expenses | | |
| Ingredients & Raw Materials | (32,500) | |
| Other | | (143) |
| Shipping/Outsourced Distribution Expenses | - | (710) |
| Total COGS Expenses | (32,500) | (853) |
| Occupancy Expenses: | | |
| Rent | (4,434) | |
| RE Taxes | (278) | |
| Utilities | | |
| Warehouse Expenses | | |
| Total Occupancy Expenses | (4,712) | - |
| Other Operating Expenses: | | |
| Insurance | (1,511) | |
| Capital Leases, Storage | (761) | (304) |
| Software | (1,294) | (1,784) |
| Marketing | (4,000) | |
| Sales Support | (5,000) | |
| Miscellaneous | (1,500) | |
| Total Other Operating Expenses | (14,066) | (2,088) |
| Net Operating Cash Flow | (95,673) | 13,769 |
| Restructuring Costs: | | |
| Legal Fees - GR&B Counsel | (2,000) | |
| Legal Fees - DIP Lender Counsel | | |
| Legal Fees - Bankruptcy Counsel | | |
| Legal & Professional Fees - CPA Taxes | | |
| Legal & Professional Fees - Misc. | | |
| US Trustee Fee | | |
| Total Restructuring Costs | (2,000) | - |
| Net Cash Flow Before Financing | (97,673) | 13,769 |
| DIP Financing/Other: | | |
| Borrowing/(Repayment) (b) | 145,000 | |
| Catch Up AP (c) | (3,000) | |
| Taxes (d) | (34,092) | |
| Interest/Fees (e) | | |
| Total DIP Financing/Other | 107,908 | - |
| Net Cash Flow | 10,235 | 13,769 |
| Ending Cash | 10,349 | 24,118 |

Notes:
(a) Payroll tax rates have not yet been announced for 2021, so payroll numbers will change, but estimated to increase.
(b) DIP includes a cash sweep mechanism for any Week in which cash proceeds exceed $25k, with 100% of the excess amount used to repay the outstanding DIP loan balance.
(c) Includes critical vendors and pre-petition legal fees.
(d) Annual payment; sales tax and state fees/taxes.
(e) All DIP fees will accrue.

**EXHIBIT A**

GL BRANDS 13-Week Ch. 11 Cash Flow Forecast

| Week Commencing (Sunday) | Week 1 12/20/20 | Week 2 12/27/20 | Week 3 01/03/21 | Week 4 01/10/21 | Week 5 01/17/21 | Week 6 01/24/21 | Week 7 01/31/21 | Week 8 02/07/21 | Week 9 02/14/21 | Week 10 02/21/21 | Week 11 02/28/21 | Week 12 03/07/21 | Week 13 03/14/21 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash | 114 | 10,349 | 24,118 | 9,752 | 4,116 | 5,323 | 21,563 | 10,581 | 5,883 | 8,496 | 33,496 | 5,186 | 16,800 | 114 |
| Operating Cash Receipts | 5,000 | 16,710 | 6,250 | 6,250 | 6,250 | 19,038 | 7,188 | 7,188 | 7,188 | 120,038 | 6,000 | 6,000 | 6,000 | 219,100 |
| **Cash Disbursements** | | | | | | | | | | | | | | |
| **Payroll:** | | | | | | | | | | | | | | |
| Payroll & Benefits (PEO) (a) | (49,395) | | (56,731) | | (52,199) | | (52,199) | | (56,731) | | (52,199) | | (56,731) | (376,185) |
| Contracted Employees | | | (5,092) | | | | (5,092) | | | | (5,092) | | | (15,276) |
| COVID-19 Employer SS Deferral Repayment | | | | | | | | | | | | | | - |
| Total Payroll | (49,395) | - | (61,823) | - | (52,199) | - | (57,291) | - | (56,731) | - | (57,291) | - | (56,731) | (391,461) |
| **COGS Expenses** | | | | | | | | | | | | | | |
| Ingredients & Raw Materials | (32,500) | | | | | | (250) | | | | (10,890) | | | (43,390) |
| Other | | (143) | (200) | | | | | | | | (500) | | | (1,093) |
| Shipping/Outsourced Distribution Expenses | | (710) | (200) | (2,190) | | (710) | (250) | (2,190) | | (710) | | (2,190) | | (8,700) |
| Total COGS Expenses | (32,500) | (853) | (200) | (2,190) | - | (710) | (250) | (2,190) | - | (710) | (11,380) | (2,190) | - | (53,183) |
| **Occupancy Expenses:** | | | | | | | | | | | | | | |
| Rent | | | (3,200) | | | | (3,200) | | | | (3,200) | | | (9,600) |
| RE Taxes | (4,434) | | | | | | | | | | | | | (4,434) |
| Utilities | (278) | | (400) | (654) | (278) | | (400) | (654) | (278) | | (400) | (654) | (278) | (4,274) |
| Warehouse Expenses | | | | | | | | | | | | | | - |
| Total Occupancy Expenses | (4,712) | - | (3,600) | (654) | (278) | - | (3,600) | (654) | (278) | - | (3,600) | (654) | (278) | (18,308) |
| **Other Operating Expenses:** | | | | | | | | | | | | | | |
| Insurance | (1,511) | | (97) | (167) | (1,511) | | (97) | (167) | (1,511) | | (97) | (167) | (1,511) | (6,335) |
| Capital Leases, Storage | (761) | (304) | (123) | (1,725) | (761) | (304) | (123) | (1,725) | (761) | (304) | (123) | (1,725) | (761) | (4,826) |
| Software | (1,294) | (1,784) | (1,809) | | (1,294) | (1,784) | (1,809) | | (1,294) | (1,784) | (1,809) | | (1,294) | (21,130) |
| Marketing | (4,000) | | | (150) | (4,000) | | | (150) | (4,000) | | | (150) | (4,000) | (16,450) |
| Sales Support | (5,000) | | | (5,000) | | | | (5,000) | | | | (5,000) | | (20,000) |
| Miscellaneous | (1,500) | | (1,500) | | | | | | | | | | | (3,000) |
| Total Other Operating Expenses | (14,066) | (2,088) | (3,529) | (7,042) | (7,566) | (2,088) | (2,029) | (7,042) | (7,566) | (2,088) | (2,029) | (7,042) | (7,566) | (71,741) |
| Net Operating Cash Flow | (95,673) | 13,769 | (62,902) | (3,636) | (53,793) | 16,240 | (55,982) | (2,698) | (57,387) | 117,240 | (68,310) | (3,886) | (58,575) | (315,593) |
| **Restructuring Costs:** | | | | | | | | | | | | | | |
| Legal Fees - GRLB Counsel | (2,000) | | | (2,000) | | | | (2,000) | | | | (2,000) | | (8,000) |
| Legal Fees - DIP Lender Counsel | | | (5,000) | | | | (5,000) | | | | | (10,000) | | (20,000) |
| Legal Fees - Bankruptcy Counsel | | | (22,500) | | | | (12,500) | | | | | (12,500) | | (47,500) |
| Legal & Professional Fees - CPA Taxes | | | | | | | | | | | | | | - |
| Legal & Professional Fees - Misc. | | | | | | | | | | | | | | - |
| US Trustee Fee | | | | | | | | | | | | | | - |
| Total Restructuring Costs | (2,000) | - | (27,500) | (2,000) | - | - | (17,500) | (2,000) | - | - | - | (24,500) | - | (75,500) |
| Net Cash Flow Before Financing | (97,673) | 13,769 | (90,402) | (5,636) | (53,793) | 16,240 | (73,482) | (4,698) | (57,387) | 117,240 | (68,310) | (28,386) | (58,575) | (391,093) |
| **DIP Financing/Other:** | | | | | | | | | | | | | | |
| Borrowing/(Repayment) (b) | 145,000 | | 158,000 | | 55,000 | | 62,500 | | 60,000 | (92,240) | 40,000 | 40,000 | 50,000 | 518,260 |
| Catch Up AP (c) | (3,000) | | (81,964) | | | | | | | | | | | (84,964) |
| Taxes (d) | (34,092) | | | | | | | | | | | | | (34,092) |
| Interest/Fees (e) | | | | | | | | | | | | | | - |
| Total DIP Financing/Other | 107,908 | - | 76,036 | - | 55,000 | - | 62,500 | - | 60,000 | (92,240) | 40,000 | 40,000 | 50,000 | 399,204 |
| Net Cash Flow | 10,235 | 13,769 | (14,366) | (5,636) | 1,207 | 16,240 | (10,982) | (4,698) | 2,613 | 25,000 | (28,310) | 11,614 | (8,575) | 8,111 |
| Ending Cash | 10,349 | 24,118 | 9,752 | 4,116 | 5,323 | 21,563 | 10,581 | 5,883 | 8,496 | 33,496 | 5,186 | 16,800 | 8,225 | 8,225 |

**Notes:**
(a) Payroll tax rates have not yet been announced for 2021, so payroll numbers will change, but estimated to increase.
(b) DIP includes a cash sweep mechanism for any Week in which cash proceeds exceed $25K, with 100% of the excess amount used to repay the outstanding DIP loan balance.
(c) Includes critical vendors and pre-petition legal fees.
(d) Annual payment; sales tax and state fees/taxes.
(e) All DIP fees will accrue.

**EXHIBIT B**

| Header Company N | Aso Sort Vals | Hours/Unit | Amount |
|---|---|---|---|
| GL BRANDS, INC | CRITES JENNA R | 80 | 3,461.54 |
| GL BRANDS, INC | FRIAS ALEXANDRO DANIEL | 80 | 5,000.00 |
| GL BRANDS, INC | FRIAS CARLOS | 80 | 5,769.23 |
| GL BRANDS, INC | MOON BRIAN DALE | 80 | 5,769.23 |
| GL BRANDS, INC | NGUYEN NGOC QUANG | 80 | 5,000.00 |
| GL BRANDS, INC | WONG ROBERT HAMILTON | 80 | 2,692.31 |
| GL BRANDS, INC | JOHNSON KEVIN | 80 | 2,307.69 |
| GL BRANDS, INC | KRAMER CARL | 80 | 2,692.31 |
| GL BRANDS, INC | PEREZ TIMOTHY ALBERT | 80 | 2,615.38 |
| GL BRANDS, INC | TETEAK JAMES MYLES | 80 | 3,076.92 |
| GL BRANDS, INC | BENAVIDES NORA ANGELICA | 80 | 1,440.00 |
| GL BRANDS, INC | HAKERT TANNER COLEMAN | 80 | 1,923.08 |
| GL BRANDS, INC | PRADO MIGUEL ANGEL | 80 | 2,884.62 |
| | | | 44,632.31 |

# EXHIBIT C